**IN THE UNITED DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Leon Odendaal | ) | Case No. |
| 2708 Rachel Road, | ) | |
| Champaign, IL 61822 | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT FOR BREACH OF** |
| **v.** | ) | **CONTRACT, PROMISSORY** |
| | ) | **ESTOPPEL, VIOLATIONS OF** |
| Medical Safety Solutions, Inc., | ) | **STATE AND FEDERAL SECURITIES** |
| (A Nevada Corporation) | ) | **LAWS** |
| 87 Sawyer Parkway | ) | |
| Mansfield, Ohio 44903 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| William Schureck | ) | |
| 79 Mohican Trail, | ) | |
| Lexington, Ohio 44904 | ) | **(JURY DEMAND ENDORSED HEREIN)** |
| | ) | |
| And | ) | |
| | ) | |
| Kenneth A. Jackson | ) | |
| 87 Sawyer Parkway | ) | |
| Mansfield, Ohio 44903 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Marco S. Burnette | ) | |
| 725 Dahlia Circle, | ) | |
| Barberton, Ohio 44203 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Richard VanHorn | ) | |
| 1596 Mulligan Ct., | ) | |
| Reynoldsburg, Ohio 43068 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Dr. Albert S. Miller | ) | |
| 706 Prestwick Drive, | ) | |
| Dothan, AL 36305 | ) | |

**Defendants**

## Introduction

1.      This action sounding essentially in breach of contract and for violations of applicable securities laws, arises from the sustained and material misrepresentation of the performance, characteristics and availability of a medical product touted by Defendants as safe and available for resale and known as the "Sharps Terminator".

## Jurisdictional Statement

2.      Diversity jurisdiction is predicated under  28 U.S.C. § 1332.  The amount in controversy is in excess of $75,000, exclusive of interest and costs.

3.      The District Court has subject matter jurisdiction of this action pursuant to 1 5 USC, Section 78aa, and its federal question jurisdiction under 28 USC, Section 1331.

4.      This action is brought pursuant to Section 10(b) and Section 20(a) of the 1934 Securities Act (15 USC , Sections 78j(b) and 78t(a)) (hereinafter referred to as the "1934 Act"); and Rule l0b-5 of the Securities and Exchange Commission (17 C.F.R., Section 240.l0b-5(b)), based upon the Defendants' use of various means or instrumentalities of interstate commerce and of the mails in connection with the sale of securities, through the use of various manipulative or deceptive devices or contrivances in contravention of rules or regulations prescribed by the Securities and Exchange Commission.

5.      The District Court has supplemental jurisdiction pursuant to 28 USC Section 1367 of the Plaintiff's pendent common law and statutory claims including (but not limited to) those arising under the laws of the State of Ohio as described below.

## Venue And Choice of Law

6.     The "Master Distributer Agreement" attached as **Exhibit A** states that "Any and all litigation of the terms and conditions of this agreement shall be in Richland County, Ohio, USA." That same agreement states that, "This Agreement shall be governed by the laws of the State of Ohio."

7.     In the alternative, venue is proper under § 27 of the 34 Act as an *act or transaction* constituting the violation(s) occurred in Ohio.[1]

## THE PARTIES

### Plaintiffs

8.     The Plaintiff **Leon Odendaal** is an individual residing at the address as indicated in the caption of this Complaint.

9.     Plaintiff **Leon Odendaal** on or about July 30th 2010, in reliance upon the representations detailed in this Complaint, purchased 80,000 shares of Class A Preferred Stock in a Nevada Corporation known as Medical Safety Solutions, Inc. ("MSS") in return for the payment of $80,000.00. Subsequently, and "linked" to the purchase of actual inventory of the "Terminator" unit, Odendaal acquired an additional $20,000 worth of shares in MSS. Mr. Odendaal resides with his family in Champaign, Illinios.

10.     Mr. Odendaal was also the principal behind an Illinois Limited Liability Corporation known as "**Aloe Holdings, LLC**" the entity originally used by the Plaintiff to sell the "Terminator" medical device units.

---

[1] "[T]here need be only one act within the district for purposes of venue under the 1934 Act, so long as that act is more than an immaterial part of the alleged violation.". See: <u>Mariash v. Morrill</u>, 496 F.2d 1138, 1144 (2d Cir. 1974) (finding that mailing something from the forum state was sufficient to satisfy venue when the item was an essential element in the alleged fraud); <u>In re</u> Triton Ltd. Securities Litig., 70 F. Supp.2d 678, 687 (E.D. Tex. 1999) (finding venue proper when press releases "were sent directly into the Eastern District of Texas").

## Defendants

11.     **Medical Safety Solutions** ("MSS") was established by the Defendants as a
Nevada corporation but it has always maintained its headquarters and principal place of
business within Ohio.  MSS is currently located at 87 Sawyer Parkway, Mansfield, Ohio 44903.

12.     Defendant **William A Schureck** of Lexington Ohio at all times relevant to this
complaint served as the chief executive officer ("CEO") of MSS.  Schureck was described in
the offering materials as the "co-founder of the company… familiar with all aspects of the
operations and (he) has been instrumental in bringing the company from inception to the
marketplace."

13.     Defendant **Kenneth A. Jackson** of Glenmont Ohio at all times relevant to this
complaint served as the "director of research and development".  Jackson is further described in
the offering materials as "the inventor of our flagship products Sharps Terminator and the
Diabetic Sharps Terminator."

14.     Defendant **Albert S Miller, MD** at all times relevant to his action was a major
shareholder and member of the MSS Board of Directors.

15.     Defendant **Marco Burnette** at all times relevant to this action served as chairman
and secretary to the MSS board of directors in addition to being "a  major investor in the
company".  Mr. Burnette was further described in the offering materials as, "having served 28
years as superintendent for Manchester local schools in Akron Ohio.  He was employed by
Merrill Lynch, Pierce Fenner and Smith for six years and served as division head of OTC
Trading."

16.     Defendant **Richard Van Horn**, at all times relevant to this action served as the
treasurer to the MSS Board of directors.  Van Horn is described in the offering materials as "the
accountant for an Ohio nursing home group with 250 million in annual sales and a regional

4

restaurant company with over 100 million in annual sales" and a CPA with "extensive experience providing tax services to public and private businesses.

## The June 15th 2010 Meeting

17. One June 15th 2010 Leon Odendaal and his wife met representatives of MSS including Ken Jackson at the MSS facilities in Mansfield, Ohio. The couple was "wined and dined" - treated to a tour of Mr. Jackson's farm and the MSS offices. At this time Ken Jackson, William A Schureck and other MSS representatives, made the specific representations described below in an effort to induce Mr. Odendaal into making a substantial investment in MSS.

18. Mr. Odendaal at the time was an experienced South African businessman who resided in South Africa and who was interested in become a distributer for and shareholder of MSS. Mr. Odendaal was looking for a medical product he could sell in South Africa that was already FDA approved. FDA (U.S.) approval would result in "automatic" approval of the same product under applicable South African medical equipment regulations.

19. In reliance upon the representations detailed below Mr. Odendaal made his investment in the MSS product and in MSS stock. In further reliance upon the representations detailed below Mr. Odendaal also set up a number of distributers in South Africa to sell the MSS products.

## The "Sharps Terminator"

20. The Plaintiff in this action was induced into purchasing products and the securities of MSS based upon specific representations made by the Defendants regarding a specific product of MSS; the so-called; "Sharps Terminator". The written representations which form the basis for this action include but are not limited to those made in the documents attached to this Complaint as Exhibit B: "The 'Sharps Terminator' Medical Safety Solutions" brochure, and (Exhibits C & D) the résumés of William Schureck and Marco Burnette.

5

Collectively these documents, presented to the Plaintiff prior to his decision to invest $100,000 in MSS, are referenced herein as the "Offering Materials".

21.     The "Sharps Terminator" and the "Diabetic Sharps Terminator" were described in the Offering Materials as, "device(s) used to disable the hypodermic needles of the type currently being used by the medical industry, veterinarians, diabetics, drug abusers, and others."[2] Under item 1 of Exhibit 1 ("Description of Technology") the "Sharps Terminator" is further described as;

> "the needle destruction device invented by Kenneth A. Jackson with help and funding from William Schureck ….. The technology is a novel and patentable beyond the current state of the art because it embodies electrodes that are designed to eliminate the entire needle, rendering it a non sharp, which is important for the marketability of any novel destruction device. The technology conceals the spark, which is customary and all previous devices, and uses the top electrode as a "shear" to mechanically remove the hot "nub" from the destroyed needle, making it user friendly and safe."

22.     There were two critical descriptions of the "Sharp's Terminator" that were repeatedly used by the Defendants to solicit Plaintiff's investment in MSS Securities. The first was the claim that the "Sharps Terminator", (in Defendants' own words), "**does not** cause any sparks when disintegrating the needle. This **allows** the device to be used **anywhere** within a hospital setting."[3] (Emphasis *not* added). The second was Defendants' repeated claims that their "Sharps Terminator" had the approval of the Food and Drug Administration or "FDA approval".

23.     Both of the above claims were made repeatedly, in writings and verbally, by one of more of the Defendants both prior to and after the Plaintiff's purchase of MSS securities. Both product claims were material with respect to the marketability of the device and – more importantly -- with respect to the Plaintiff's willingness to invest in it. Neither representation was true at the times each was made, a fact which was known to the Defendants but which was

---

[2] From the undated MSS Offering Circular, "Patent Application of Kenneth A. Jackson" "Abstract"
[3] Offering circular Section 5.1

6

neither known nor reasonably discoverable to the investing Plaintiff.   In point of fact, as of the

filing of this action – approximately 3 years *after* the Plaintiff had purchased their MSS

securities - the "Sharps Terminator" is still neither "spark free" nor has does it have  "FDA

approval".

### Defendants' Misrepresentations That the "Sharps Terminator" Was a "Spark Free" Device.

24.     One doesn't have to be in the medical profession to understand how important it

was for the Sparks Terminator to be "spark free".  The product was intended to be used in

emergency rooms and operating rooms where the combination of oxygen and electrical sparks

could be disastrous.  Accordingly, in their Offering Materials, Defendants *repeatedly* assured

prospective investors - including the Plaintiff - that the medical device which would be the

subject of their investment dollars was a "spark-free" device.  A few examples:

25.     Section 2.2 of Exhibit B ("Products") describes the Sharps Terminator (or "ST")

as, *"Spark Free – With its 'spark-free" design, the ST can be used anywhere in a hospital*

*setting.  Use of oxygen nearby is not a concern."*

26.     Section 4.4 of Exhibit B ("Price Sensitivity") states; *"The ability to disintegrate*

*this wide range of needle sizes while producing no spark at all adds to the competitive advantage*

*and helps to decrease price sensitivity among consumers."* (Emphasis not added).

27.     Section 5.1 of Exhibit B ("The Competition")  bluntly repeats this claim; *"The*

*Sharps Terminator **does not** cause any sparks when disintegrating that needle.  This **allows** the*

*device to be used **anywhere** within a hospital setting."* (Emphasis not added).

28.     In addition to *written* representations, as sampled above, the Defendants - most

notably MSS CEO William Schureck - repeatedly assured potential and existing investors

including the Plaintiff in verbal conversations and e mails that the device was "spark-free".  In

fact, Defendant Schureck, and the rest of the Defendants, knew but did not disclose to their

potential and existing investors including the Plaintiff that there were serious arcing problems in their Sharps Terminator, in direct contrast to the positive claims in their Offering Materials.

29. Upon information and belief, the unresolved sparking problem in the device was a major factor in the Defendants' inability to obtain FDA approval for the product. Nevertheless, in an effort to solicit more and more new capital, Defendants repeatedly represented to potential investors including the Plaintiff that their Sharps Terminator had – or was just about to obtain – "FDA approval."

## Defendants' Misrepresentations Regarding "FDA Approval" of the Sharps Terminator

30. Defendants repeatedly used written and verbal claims that their Sparks Terminator had "FDA approval" to induce the Plaintiff's initial and subsequent investment in MSS. These claims, as with the "spark free" claims were false. These representations were made by Ken Jackson and other representatives of MSS at the June 15th 2010 Meeting described above as well as at other times during the relationship.

31. Section 2.3 ("Product Development to Date") of Exhibit B clearly implied that FDA approval for the Sharps Terminator product had either already happened or was imminent. This is consistent with the verbal assurances made by Ken Jackson to the Plaintiff at the June 15th 2010 Meeting described above. At that meeting Jackson told Odendaal that FDA proven was a "given" – that they had "already obtained *verbal* (FDA) approval."

32. The Plaintiff, who invested $80,000 in MSS in June 27th of 2010 and an additional $20,000 on July 7th 2010 was thus encouraged to believe that "FDA approval" – certainly a material factor in the success of the investment - had either already happened or that it was imminent. And Defendants, lead by Ken Jackson and William Schureck, repeatedly fueled that false belief with additional written and verbal encouragement, such as the following:

33. Section 5.4 ("Future Competition") touted the MSS "Research and Development

team" as, *"experienced in product design, the FDA approval process and the patent approval process."*

34.    Section 7.6 ("Research and Development") stated, *"Medical Safety Solutions is the owner of the FDA "Premarket Approval" (PMA) and all related technology."*

35.    There were even more blatant, written, representations that MSS had actually obtained "FDA approval" for the device. The résumés of Defendants William Schureck and Marco Bernette had been distributed to prospective shareholders including the Plaintiff as part of the Offering Materials.  The first paragraph of each of these résumés, attached as Exhibits C and D, describes each of these Defendants as being experienced with the *"marketing of the Sharps Terminator, **an FDA approved device** which destroys hypodermic needles at the point of procedure"*. (Emphasis added).

36.    Even after it was apparent to Defendants that the device would not get FDA approval, Defendants continued to insist that FDA approval was imminent and – concurrently – represented that they had obtained orders from *outside the United States* (which did not require "final" FDA approval) that would make the company profitable. These representations, which were false, were made with the intent to solicit *additional* capital from the Plaintiff and/or to deter the Plaintiff from discovering the true status of the Terminator and seeking the return of his investment.

37.    Defendants' repeated representations that their device had *already obtained* "FDA approval" or that it was *just about to obtain* "final" FDA approval anytime in the near future was much more than wishful thinking or "puffing".  Such deliberate representations were material and they were false.

### "FDA approval" misrepresented as an advantage over the competition

38.    In touting MSS's advantages over potential competitors, the Defendants

9

emphasized that *"FDA approval for a new product is the initial barrier. This is time consuming and even a quick approval may take months."* (Offering Materials, 3.4 ("Barriers to Entry")). These statements were made in conjunction with Defendants' repeated claims that – unlike their competitors – Defendants , supposedly well-versed in the process, had *already obtained* FDA approval, (or) had obtained "verbal" FDA approval (or) were only awaiting "final" "FDA approval" and thus they could commence to market their device and gain the upper ground over potential competitors.

### DEFENDANTS LINK THE PURCHASE OF MSS STOCK TO THE PURCHASE OF TERMINATOR INVENTORY FOR RESALE

#### The "Master Distributer Agreement"

39.    In fact, Defendants actively solicited the Plaintiff to *market* the Sharps Terminator. Defendants went so far as to solicit and obtain *orders* for the devices from their shareholder/distributers – orders that could not be filled because (as Defendants themselves were well aware) there was no "spark free" , "FDA approved" device to sell.

40.    In the case of the Plaintiff, Defendants linked his purchase of MSS stock to his becoming a "Master Distributer". The "*Master Distributor Agreement*" ("MD Agreement") which is attached as Exhibit A required the Plaintiff to purchase 2500 "Terminator" units at $250.00 each.[4]

41.    In reliance upon the representations detailed in this Complaint; on or about June 30th 2010, Mr. Odendaal wired MSS Eighty Thousand Dollars ($80,000.00) ostensibly in payment for 320 Terminator units to be shipped to the Plaintiff in South Africa for resale there[5].

---

[4] 5.    The "Master Distributer Agreement" attached as Exhibit A states that "Any and all litigation of the terms and conditions of this agreement shall be in Richland County, Ohio, USA." That same agreement states that "This Agreement shall be governed by the laws of the State of Ohio."

[5] Plus the additional 80 units for $20,000.

10

42.     Paragraph 4 of the Master Distributor Agreement bluntly states that; "**MSS shall provide MD with Sharps Terminators at a cost of $250.00 US per unit, FOB Mansfield, Ohio USA ...**" The MD was signed effective June 15th 2010.

43.     More than two years later - as of the filing of this Complaint - **MSS had not been able to provide the Plaintiff with a single "Sharps Terminator" suitable for resale[6].**

44.     When he signed the MD Agreement in June of 2010, Plaintiff was a citizen of South Africa, residing in that country, and ready, willing and able to receive the Sharps Terminators he had ordered and market the products in that country – presuming they worked as he had been told they would.

45.     Since June of 2010 Plaintiff has been frustrated by Defendants' inability to provide any working Sharp's Terminators suitable for demonstration or resale. Even after Plaintiff relocated himself and his family to the United States he continued to press Defendants for the delivery of the Sharp's Terminators for resale either in the US or in South Africa, where he still had distribution and marketing contacts. Defendants were simply unable to send him any working Sharp's Terminators suitable for resale, either to South Africa or to the United States.

46.     During the same period (June 29th 2010) in which he signed the MD Agreement and in reliance upon the misrepresentations detailed in this Complaint; Leon Odendaal also signed a Subscription Agreement which acknowledged his purchase of 80,000 shares of common stock in MSS at "0.0001 per share" – for a total payment of $8.00.

47.     In reliance upon the misrepresentations detailed in this Complaint; on or about July 7th 2010 Mr. Odendaal wired an *additional* Twenty Thousand Dollars ($20,000.00) to MSS.

48.     In making the representations described in this Complaint, and others, Defendants

---

[6] 4 Units for demonstration purposes were finally delivered to the Plaintiff on or about Aug 29th 2010.. These unites were sent to Plaintiff when he was in South Africa, his native land, but MSS was never able to provide Plaintiff with the electric converter necessary to operate the units in that country's 220 volt environment.

knew but *did not disclose* to prospective investors including the Plaintiff that there were significant problems associated with the Sharps Terminator including but not limited to the electrical sparking problems which they knew had prevented and would continue to prevent Defendants from obtaining "FDA approval" until the problems were resolved.

49.    Defendants further knew that their representation of the Sparks Terminator as "spark free" and their (related) representation that the device was either already FDA approved or that it would be FDA approved within the next month or two were both material misrepresentations related to the sale of a security and that perspective investors including the Plaintiff would reasonably rely upon these and similar representations in their decision to purchase"Terminator" inventory and MSS securities.

### (Breach of Contract)

### COUNT ONE

50.    Plaintiff incorporates herein all of the preceding allegations of the Complaint as if fully reproduced herein.

51.    Defendants have breached their obligation under the MD Agreement to "**provide MD with Sharps Terminators at a cost of $250.00 US per unit, FOB Mansfield, Ohio USA ...**"

52.    Without any Terminator inventory to resell, Plaintiff struggled to make a living. Eventually he moved to Illinois, U.S. where he could sell insurance through an Allstate Insurance agency. Even in Illinois, he continued to press Defendants' for delivery of the units.

53.    Defendants' kept promising pending "FDA approval" and a future flow of products for resale but eventually the delays and problems with the product, and loss of confidence resulted in Plaintiffs realization that Defendants simply could not and would not supply the product in numbers or quality suitable for resale and, by this Pleading, Plaintiff has

declared Defendants to be in breach of their obligations under the MD Agreement.

## (Violations of Federal Securities Law)

### COUNT TWO

54. Plaintiff incorporates herein all of the preceding allegations of the Complaint as if fully reproduced herein.

55. § 12(A)(2) of the 1933 Act (15 U.S.C. § 77l(a)(2)) creates liability when there is an offer or sale of a security "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

56. Rule 10b-5 promulgated under the 1934 Act (17 C.F.R. 240.10b-5) states, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

in connection with the purchase or sale of any security.

57. To establish liability under § 10(b) of the Securities Exchange Act and under Rule 10b-5, a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) with

scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the

plaintiff's damages.' Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999)

(Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1261 (4th Cir. 1993)).

58.    As stated with specificity above, Defendants' misrepresentation of

material facts regarding the Terminator, including that it was "spark free" and "FDA

approved" constitute false statements or omissions of material fact , made with *scienter*

upon which the Plaintiff justifiably relied and that proximately caused the Plaintiff's

damages.

## COUNT THREE

### Claim of Control Under the 1934 Act

59.    Plaintiff incorporates herein all of the preceding allegations of the Complaint as

the same are applicable hereto and as if fully reproduced herein.

60.    Section 20(a) of the 1934 Act provides that every person who directly or

indirectly controls a person liable under any other provision of Title 15 of the United States Code

shall also be liable jointly and severally with and to the same extent as such controlled person is

liable to persons such as the Plaintiff. See 15 USC, Section 78t(a).

61.    Defendants were in positions to control and/or influence the management of MSS

in the preparation of the Offering Materials, including the opportunity to provide omitted

material information that should have been disclosed in those Offering Materials before those

materials were provided to Plaintiff.

## COUNT FOUR

### Claims of Promissory Estoppel and Equitable Rescission

62.    Plaintiff incorporates herein all of the preceding allegations of the Complaint as

14

the same are applicable hereto and as if fully reproduced herein.

63.     Plaintiff are entitled to equitable rescission of the amounts obtained by Defendants as a result of Defendants' misrepresentations and concealment of material facts, in violation of the substantive and applicable provisions of the 1934 Act and Rule 10b-5.

64.     Plaintiff is further entitled, in the alternative, to damages arising from the enforceable promises detailed in this Complaint and made to him by the Defendants regarding the "Sharps Terminator" – promises reasonably relied by him to his detriment.

## (Violations of State Securities Acts)

## COUNTS FIVE & SIX

65.     Defendants' acts and omission were made in violation of applicable State securities Acts ("Blue Sky Laws") including Ohio's Securities Act (R.C. 1707.01 et seq), and Nevada's Securities Act[7], N.R.S. 90.570 et seq.

## Claim of Statutory Nevada Securities Fraud

66.     Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

67.     Nevada – as with all other applicable "Blue Sky" laws - prohibits misrepresentation of material facts concerning the sale of securities, including the acts and omissions employed by the Defendants in the sale of MSS securities as described above. Typical of most states, Nevada's Securities Act, states that; In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly:

1. Employ any device, scheme or artifice to defraud;

---

[7] It is anticipated (without conceding) that Defendants will argue the applicability of Nevada state law by referencing some ambiguously worded "choice of law" language in one of the Offering Materials. Even under Nevada law, however, Plaintiff have asserted a cognizable cause of action.

15

2. Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or

3. Engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person. N.R.S. 90.570

68.     The case is timely brought even under Nevada's Securities Acts, which states that: A person may not sue under NRS 90.660 unless suit is brought within the earliest of 2 years after the discovery of the violation, 2 years after discovery should have been made by the exercise of reasonable care, or 5 years after the act, omission or transaction constituting the violation. N.R.S. 90.670.

69.     Nevada's Securities Acts – like other Blue Sky Laws, extends civil liability to each of the named Defendants, *not just the CEO and the "principals"*: "A person who ***willfully participates*** in any act or transaction in violation of NRS 90.580 is liable to a person who purchases.

70.     Nevada further extends liability under its Securities Act to , "A person who directly or indirectly controls another person who is liable under subsection 1 or 3, a partner, officer or director of the person liable, a person occupying a similar status or performing similar functions, any agent of the person liable, an employee of the person liable if the employee materially aids in the act, omission or transaction constituting the violation, and a broker-dealer or sales representative who materially aids in the act, omission or transaction constituting the violation, are also liable jointly and severally with and to the same extent as the other person." N.R.S. 90.660.

71.     Recoverable damages under Nevada's Securities Act include interest and attorney's fees.

## Claim of Statutory Ohio Securities Fraud

72.     Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

73.     Defendants' actions violated the antifraud provisions of the Ohio Securities Act at RC § 1707.44(G). The provision provides as follows: "No person in selling securities shall knowingly engage in any act or practice which is, in this chapter, declared illegal, defined as fraudulent, or prohibited."

74.     The definition of "fraud" in R.C. §1707.01(J) states that, "'Fraud' means...; any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise; and act, practice, transaction, or course of business relating to the sale of securities which is fraudulent or which has operated or would operate as a fraud upon the purchaser."

75.     The Defendants are *jointly and severally liable* to the Plaintiff, and the Plaintiff are entitled to the civil remedies prescribed under R.C. §1707.43, which provides in pertinent part:

"Every sale or contract for sale made in violation of Chapter 1707 of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person who has *participated in* or *aided* the seller *in any way* in making such sale or contract for sale, are jointly and severally liable to such purchaser, in an action at law in any court of competent jurisdiction.. . for the *full amount paid by such purchaser...* unless the court determines that the violation did not materially affect the protection contemplated by the violated provision"

76.     Defendants violated the provisions of Section 1707.41 of the Ohio Revised Code by knowingly, recklessly and negligently failing to represent material facts about the Sharps Terminator including that it was neither "spark free" nor "FDA approved" in the Offering Materials provided to Plaintiff, which facts were omitted or misrepresented to induce Plaintiff's offer to purchase inventory for resale and said shares of stock.

77.     Defendants are liable pursuant to the provisions of Section 1707.41 and Section 1701 .43 of the Ohio Revised Code for the Plaintiff's damages proximately resulting from the Plaintiff's offer to invest, including without limitation Plaintiff' recovery pursuant to Section 1707.43 of the Ohio Revised Code, of the amounts tendered by the Plaintiff.

## COUNT SEVEN

### Claim of Common Law Fraud

78.     Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

79.     Defendants misrepresented and concealed facts that were material to Plaintiff' decision to invest in MSS when they solicited investment in Class A shares of preferred stock in MSS through their Offering Materials at a time when they knew there were significant unresolved problems with the "Sharps Terminator" and that "FDA approval" had neither been obtained nor was it imminent given the severity of the problems.

80.     Defendants misrepresented and concealed those material facts with the intent of causing Plaintiff to rely upon their misrepresentations and concealments, for the purpose of obtaining Plaintiff' investment in their operations, and for the purpose of misleading the Plaintiff to invest in an insolvent company thinking that it was solvent.

81.     Plaintiff were justified in relying upon the statements communicated to Plaintiff orally by the Defendants and in the Offering Materials, including the belief that their funds would be held in a special account pending a successful completion of the capital campaign.

82.     Plaintiff has lost the value of his investment as a proximate result of his justifiable reliance upon the Defendants' misrepresentations and concealments.

83.     Defendants committed their acts of fraud maliciously and in reckless disregard of

18

the injuries they would cause Plaintiff to suffer, as a result of which Plaintiff is entitled to recover punitive damages and reasonable attorney fees.

## COUNT EIGHT

### Claim of Breach of Fiduciary Duty

84.     Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

85.     MSS is a closely-held corporation pursuant to Ohio Revised Code, Section 1701.591, Nevada N.R.S. 78.010 et seq. and Ohio and Nevada common law.

86.     Defendants owed fiduciary duties to the Plaintiff by reason of their status as majority or controlling shareholders, directors and officers of a closely-held corporation, including without limitation duties to use reasonable care in reviewing the Offering Materials before they were distributed to potential investors, reasonable care to ensure the Offering Materials did not include material omissions of the financial circumstances, reasonable care to supervise the deposit of Plaintiff funds to a special account pending results of the sale of Class A Preferred Shares, reasonable care to ensure any funds received in the subscription would not be utilized for purposes not described in the Offering Materials, and reasonable care to treat subscribers to the Class A preferred Shares consistently without favoring one group of those investors over another.

87.     Defendants caused or allowed MSS to use the funds received from the Plaintiff to service outstanding liabilities of MSS which were not described among the uses to which proceeds from the sale of the Class A preferred shares would be put.

88.     Defendants breached the fiduciary duties of care owed to the Plaintiff identified above, when they induced the Plaintiff to invest in MSS without disclosing the precarious

19

financial position of the company, and when they applied the capital they received from the Plaintiff to the payment of company obligations without depositing and holding those funds in escrow pending a successful completion of the purposes of the subscription offering as they did with other investors who offered investments for the Offering after the Defendants received the Plaintiff funds.

89.     Defendants either owned shares of stock in the company or were entitled by reason of their status as officers or directors to exercise options to acquire such shares of stock.

90.     Defendants engaged in self-dealing to protect their pecuniary interests when they breached their fiduciary duties owed to the Plaintiff.

91.     Defendants further breached the fiduciary duty they owed to Plaintiffs by failing to hold an MSS annual shareholder's meeting, or any shareholders' meeting, by failing to distribute an MSS Annual report and by failing to communicate in any organized way with all the MSS shareholders.

92.     Plaintiff has lost the value of his offer to subscribe in MSS as a proximate result of the Defendants' self-dealing breach of fiduciary duties owed to the Plaintiff.

## COUNT NINE

### Claim of Negligent Misrepresentations

93.     Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

94.     The Defendants solicited Plaintiff in the course of their business and employment with MSS to invest in the company, with the agreement and authority of the remaining Defendants.

95.     The Defendants had a pecuniary interest in the transaction for which reason they

solicited Plaintiff investment to protect their own interests as shareholders, directors, officers and employees of MSS.

96.    The Defendants supplied false information to Plaintiff when they solicited and obtained Plaintiff investment by failing to disclose the company's insolvency as the true reason for soliciting that investment.

97.    Plaintiff justifiably relied to his detriment when they accepted Defendants' misrepresentations concerning the solvency of the company in guiding Plaintiff' decisions to make his investments.

98.    The individual Defendants failed to exercise reasonable care or competence in communicating the reason why they were soliciting an investment from Plaintiff in the company, and in not escrowing the funds received from Plaintiff until learning if the subscription would be substantially successful.

99.    Plaintiff has been damaged as a proximate result of the negligent misrepresentation of Schureck and the remaining Defendants in communicating the reason why they were soliciting an investment from Plaintiff in the company and in not escrowing Plaintiff' funds.

## COUNT TEN

### Claim for Equitable Relief

100.    Plaintiff incorporates herein all of the preceding allegations of the Complaint as the same are applicable hereto and as if fully reproduced herein.

101.    It is probable that the business of MSS is threatened with and will be subjected to many lawsuits and that Defendants have and will continue to participate in transactions resulting in preferences to creditors other than Plaintiff, and that assets of Defendants are in danger of

21

dissipation and depletion during the pendency of these proceedings, unless temporary, preliminary and permanent injunctive relief should issue in favor of Plaintiff to enjoin Defendants from conveying away their assets.

102. Plaintiff will suffer irreparable injury without adequate remedy at law if Defendants are permitted to transfer or convey assets to third parties, some of whose identities will be learned during discovery in this case, without being restrained from those transfers and conveyances.

## PUNITIVE DAMAGES

103. The Plaintiff incorporates the preceding paragraphs as if fully rewritten herein. Punitive damages may be awarded in this action if the jury finds that the Defendants' acts and omissions constituted a breach of their fiduciary duties, a tort action under Ohio law. It is well settled that punitive damages are available in tort actions where the wrongdoer acts with "actual malice."

104. "Actual malice" is a state of mind that can be characterized by a conscious disregard for the rights and safety of others where there is a great probability that substantial harm will result. *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987)). "Conscious disregard" has been expanded under Ohio law to include behavior that may be characterized as "reckless, wanton, willful or gross." The conduct of the Respondents was no less than reckless, wanton and gross and may well be demonstrated to have been willful. If so determined, punitive damages may be awarded in an amount sufficient to both punish the Defendants and to deter them from engaging in similar conduct in the future.

## PRAYER FOR DAMAGES

**WHEREFORE**, Plaintiffs have been damaged pursuant to each Count, in the amounts invested in MSS - $100,000.00 ***Plus*** interest, punitive damages, and the costs of this litigation including attorneys' fees.

Respectfully submitted,

Thomas C. Wagner, Esq. (0003301)
THOMAS C. WAGNER, LLC
1610 The Hanna Building
1422 Euclid Avenue
Cleveland, OH 44115-2001
(216) 781-4000
(216) 781-5666 (fax)
wagnert@tcwlawyers.com
ATTORNEY FOR PLAINTIFF

## JURY DEMAND

Plaintiff demand a trial by jury of the within issues by the maximum number of jurors permitted by law.

Respectfully submitted,

Thomas C. Wagner, Esq. (0003301)
Thomas C.  Wagner, LLC
1422 Euclid Avenue, Suite 1610
Cleveland, OH 44115
216-781-4000
216-781-5666 fax
wagnert@vwlawyers.com

23